UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                        :
                                              :     Chapter 11
MERCON B.V.,                                  :
                                              :     Case No. 23-11947 (MEW)
                   Debtor.                    :
-------------------------------------------------------------x

**DECISION WITH RESPECT TO THE LIQUIDATING TRUST'S LIMITED OBJECTION TO THE FEE APPLICATION OF RIVERON MANAGEMENT SERVICES, LLC AND WITH RESPECT TO THE PAYMENT OF ADMINISTRATIVE CLAIMS FOR WHICH PRIOR ESCROWS WERE INSUFFICIENTLY FUNDED**

A P P E A R A N C E S:

R3M Law, LLP
New York, New York
*Attorneys for Marc S. Kirschner, as Liquidating Trustee*
  By:   Howard P. Magaliff, Esq.

Polsinelli PC
New York, New York
*Attorneys for Riveron Management Services, LLC*
  By:   Mark B. Joachim, Esq.

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

Riveron Management Services, LLC was retained to provide services to Mercon Coffee Corporation and its affiliated debtors in their chapter 11 cases,[1] and Harve Light of Riveron served as Chief Restructuring Officer. A plan of reorganization was confirmed on July 30, 2024, and pursuant to the confirmed plan a Liquidating Trust was established, for which Marc S. Kirschner acts as Liquidating Trustee. The Liquidating Trust Agreement provided that the

---

[1] The Debtors' cases were procedurally consolidated under case no. 23-11945, but after the Plan was confirmed most of the cases were closed and all remaining matters were scheduled to be administered through the case originally filed by Mercon B.V., which is case no. 23-11947. Citations herein to the "MC ECF" docket are citations to the docket in case no. 11945, and citations to the "BV ECF" docket are to the docket in case no. 23-11947.

1

amounts needed for professional fee claims, and amounts needed for other administrative claims, would be estimated and that escrows would be established in the amounts of those estimates. The escrows were to be funded from operating cash that the Debtors held and that otherwise would have been cash collateral of a group of secured lenders for whom Rabobank acted as agent. The lenders agreed that all amounts necessary for the payment of administrative expenses (including professional fees) could be taken out of that collateral at the same time as certain other escrows were established, and that any balance would be paid to the lenders.

Riveron provided estimates of the amounts needed for a professional fee escrow account and for a separate escrow account for other administrative claims. After the escrows were funded, a cash balance of $1,218,787.85 remained, which was turned over to Rabobank for distribution to the prepetition secured lenders. It appears that the escrow for professional fees was adequately funded. However, Riveron made mistakes in calculating the amounts needed for the separate administrative claims escrow. It failed to include amounts that ultimately turned out to be payable to Kroll Restructuring Administration LLC in its capacity as the retained claims agent ($348,533.35) and the law firm of Miller Friel, PLLC ($57,175.42), which had been retained as an "ordinary course" professional firm.

No party objected to the administrative claims that were filed by the claims agent and by Miller Friel. There is no dispute (1) that the confirmed plan requires that all administrative claims be paid in full, (2) that the prepetition secured lenders had agreed that those payments would be funded by amounts that otherwise would have been the lenders' cash collateral, (3) that the administrative claims filed by the claims agent and by Miller Friel were valid and allowable, and (4) that the fee application by Riveron is reasonable and valid except to the extent that Riveron should be penalized for the mistake that it made. There is also no dispute that if the

amounts payable to Kroll and to Miller Friel had been included in the original escrow amounts, then the amounts of cash paid to the secured lenders would have been reduced – just as Rabobank and the secured creditors had previously agreed, and just as the Plan contemplated. Paying the claims out of monies that otherwise would be distributed to the secured lenders therefore will just put them in the same position that they would, and should, have been in if the mistake had not occurred. However, the Liquidating Trustee has raised the question of whether the Liquidating Trust Agreement permits him to pay the "shortfall" out of any amounts other than the escrow accounts. He has contended that Riveron's fees should be reduced by the full amount of the shortfall in those accounts to make up for the "damage" to the secured lenders that has allegedly resulted from Riveron's mistake. *See* Objection, BV ECF No. 33, at ¶¶ 3, 14; Declaration of Marc S. Kirschner, BV ECF No. 34, at ¶¶ 23-24.

The secured lenders did not join in the Liquidating Trustee's objection. I asked the lenders' counsel to appear at the hearing on this matter so that I could discern the lenders' position and whether the lenders would consent to the full payments of administrative claims out of what would otherwise be their collateral, as they had originally agreed. I was told at the hearing, however, that Rabobank no longer was agent for the group and could not speak for the group. The Liquidating Trustee took the position at the hearing that he could pay all of the administrative claims from amounts that would otherwise be paid to the lenders if I so ordered, but said he was not certain whether he was otherwise permitted to do so.

Resolving this unexpected problem requires a review of the relevant provisions of the confirmed plan and the Liquidating Trust Agreement.

Section 3.03(b) of the confirmed plan provides that all administrative claims are to be paid in full. MC ECF No. 514, at § 3.03(b). It also provides that holders of administrative

3

claims would be subject to an "Administrative Claims Bar Date" that would be 30 days after the Effective Date of the plan. *Id.* at §§ 1.4, 3.03(a), 14.01. The plan contemplated the creation of an escrow account for professional fee claims (as described below), but there is no mention in the plan itself of any escrow for other administrative claims. The separate Liquidating Trust Agreement contemplated that an escrow for such administrative claims would be established on the Effective Date, but there are no provisions in the confirmed plan that purport to restrict the recoveries by administrative claimants to the amounts that might be set aside in such an escrow account. The Administrative Claims Bar Date did not even occur until 30 days *after* the Effective Date, and therefore 30 days *after* the escrow account was to be funded. It was quite plain, given the timing, that the original funding could only represent an estimate of what the administrative claims would be, and that the real amounts would be determined later.

Section 3.03(b) of the confirmed plan provides that retained professionals' claims must be paid in full, and sections 3.04(b) and 3.04(c) contemplated that an escrow account would be set up to cover the estimated amounts of such professional fees and expenses. *Id*. at §§ 3.03(b), 3.04(b), 3.04(c). Section 3.04(d) of the plan state explicitly, however, that the obligations to pay professional fee claims is not limited by the amounts deposited in the professional fee escrow account, and that payments for services rendered during the chapter 11 case would come from the secured parties' cash collateral to the extent authorized by prior cash collateral orders "or other order of the Bankruptcy Court." *Id*. at § 3.04(d).

Section 3.07(a) of the plan provided that the amount of the secured creditors' cash collateral that was not needed for the funding of reserves, or to make the various "Distributions" that the plan required, would be turned over to Rabobank for payment to the secured lenders.

4

But as noted above, some of those required "Distributions" were payments to the holders of professional fee claims and other administrative claims.

There is nothing in the foregoing plan provisions that limits the rights of administrative claimants, including holders of professional fee claims, to the amounts that were set aside in the various escrow accounts that were set up on the Effective Date. The administrative claims had to be paid, and the secured lenders agreed that those payments would be made from cash that otherwise would have been collateral for the repayment of their claims.

The Liquidating Trust Agreement makes clear that its provisions are subordinate to the requirements of the confirmed plan. *See* Liquidating Trust Agreement, MC ECF No. 649, at §§ 2.01, 3.02, 3.03(b), 5.03(xi), 6.01. The terms of the confirmed plan are deemed to have been incorporated into the Liquidating Trust Agreement, and are deemed to take precedence in the event of any conflict between the plan and the Liquidating Trust Agreement. *Id*. at § 3.02. The Liquidating Trustee has the right to make Distributions "in accordance with the terms of the Plan," and all Distributions are to be "consistent with [the Plan]" and the orders of this Court. *Id*. at §§ 3.03(b), 6.01, 6.03. Section 6.05(i) of the Liquidating Trust Agreement further provides that the trustee may "retain" amounts needed "to pay reasonable administrative expenses" and to "satisfy all other liabilities incurred or assumed by the Liquidating Trust (or to which the Liquidating Trust Assets are otherwise subject) in accordance with the Plan and this Agreement . . ." *Id.* at § 6.05(i). The obligations to pay all allowed professional fees and other administrative expenses are obligations of the Liquidating Trust, and are liabilities to which the Liquidating Trust assets are subject, in each case pursuant to the terms of the confirmed plan.

The Liquidating Trustee's counsel pointed out, at the hearing on this matter, that under section 6.03(a) of the Liquidating Trust Agreement the secured lenders, as the holders of the

5

Class A interests, would have the "exclusive right to receive any proceeds from the liquidation of Liquidation Trust Assets that constituted Prepetition First Lien Collateral." *Id*. at § 6.03(a). The Liquidation Trustee raised the question of whether this provision prevents him from paying administrative claims from sources other than the pre-established escrow accounts. However, section 6.03 cannot be interpreted in a manner that would make it inconsistent with the provisions of the confirmed plan. Section 6.03, like all of the distribution provisions of the Liquidating Trust Agreement, is subject to the overriding requirement that "Distributions" be consistent with the confirmed plan. There is nothing in the confirmed plan that says that administrative claimants are to be limited to the amounts that were set forth in the "estimated" escrow account, or that even contemplated that such an escrow would exist; section 6.03 cannot be interpreted as imposing such a limit, and I would not have confirmed the plan if any such limit had been imposed. The confirmed plan requires that the claims be paid -- not that they be limited to the prior estimates -- and that the payments are to be funded from cash that otherwise would be the collateral of the lenders who now are holders of the Class A trust interests.

The Liquidating Trustee's arguments over the interpretation of section 6.03(a) also prove too much. The parties represented at the hearing that the alleged "shortfall" here was in the escrow for administrative claims, not in the separate escrow for professional fee claims. The Liquidating Trustee is of the view that if Riveron's fees are reduced, the balance of the professional fee escrow account could be used to cover the shortfall in the escrow account for other administrative claims. Objection, BV ECF No. 33, at ¶ 14. However, the confirmed plan provides that any excess in the professional fee escrow must be treated as "Prepetition First Lien Collateral." Plan, MC ECF No. 514, at § 3.04(c). Even under the Liquidating Trustee's proposal, therefore, the shortfall in the administrative claims escrow account would be funded by

6

amounts that otherwise would constitute the secured lenders' collateral and that otherwise would be payable to the holders of Class A trust interests pursuant to section 6.03 of the Liquidating Trust Agreement.

The fact that Kroll's and Miller Friel's administrative claims have been allowed (without objection by any party), and the fact that nobody has objected to their payment, is implicitly an admission that the amounts of those administrative claims are not limited to the amounts set forth in the administrative claims escrow account. The Liquidating Trustee's proposal that Riveron's fees be reduced, and that the balance of the professional fee escrow be used to cover the shortfall in the administrative claims escrow, also is implicitly an agreement that amounts that otherwise would be the secured lenders' collateral can be used to cover that shortfall, notwithstanding the wording of section 6.03 of the Liquidating Trust Agreement.

If I were to interpret the Liquidating Trust Agreement as though it limited the payment of administrative claims to the estimated escrow accounts, and as though the secured lenders' rights otherwise took priority over the rights of the administrative claimants, then the Liquidating Trust Agreement would undercut the clear contrary provisions of the confirmed plan. That would violate section 3.02 of the Liquidating Trust Agreement, which incorporates the terms of the plan and provides that the provisions of the plan take precedence. The Plan requires the payment of the allowed administrative claims of Kroll and Miller Friel, and it requires the payment of the professional fees of Riveron to the extent those fees are approved. In order to comply with those clear terms of the Plan those amounts must be paid from funds that otherwise would be paid to the prepetition secured lenders who were represented by Rabobank. Doing so imposes no "injury" on those lenders. Instead, it simply implements the agreement that those lenders previously and explicitly made, in the manner that the confirmed plan contemplates.

7

The remaining issue is whether Riveron's error is grounds for a reduction to its allowed fees and expenses. I have not received a completely satisfactory answer as to just how the error occurred, which suggests that Riveron did not poll those entities before making its estimates, or did not carefully check prior payment records, or that some other oversight was involved. However, I see no reason in law or equity why Riveron's error should result in a windfall to the secured lenders. Plainly the error has resulted in some expense and litigation that otherwise would not have been necessary, though quite frankly it strikes me that the contention that the mistake has injured the secured creditors is specious, and this issue should have been resolved much more easily and without the need to involve the Court. I will reduce Riveron's fees by $20,000 but will otherwise grant its final application for allowance of its fees and expenses.

## Conclusion

For the foregoing reasons, Riveron's final application for the payment of fees and reimbursement of expenses shall be GRANTED, except that Riveron's approved fees shall be reduced by $20,000. In addition, the Liquidating Trustee is authorized and directed to pay all allowed professional fee claims and all other allowed administrative expenses, regardless of whether the previously-established escrow accounts were sufficient to cover those sums, and if necessary such payments shall be made out of amounts that otherwise would have been payable to the holders of Class A trust interests. The Liquidating Trustee and Riveron are directed to agree on the forms of Orders that reflect these rulings and to submit the same to the Court.

Dated: New York, New York
      October 18, 2024

                                               **s/Michael E. Wiles**
                                               Honorable Michael E. Wiles
                                               United States Bankruptcy Judge